## CROSBY v. EMERSON.

(Circuit Court of Appeals, Third Circuit. January 19, 1906.)

### No. 41.

1. BILLS AND NOTES—FRAUD—INSTRUCTIONS.

In an action on a note given for the price of mining stock, defendant claimed fraudulent representations and requested the court to charge that, if the jury believed that any representation made by the seller of the stock to defendant was material and fraudulent, and that defendant relied thereon as true in the purchase of the stock, defendant was entitled to judgment, though he afterwards promised to pay the note. The court, in answer to the request, charged that, if the jury believed that the statements and representations made by the seller to defendant were material and fraudulent, and that defendant relied thereon as true in the purchase of the stock, defendant was entitled to judgment, though defendant afterwards promised to pay the note, but that the court did not remember there was any evidence of any promise made to pay the note. *Held*, that the instruction given was more favorable to defendant than he was entitled to demand.

2. SAME.

In an action on a note alleged to have been procured by fraud, it was proper for the court to refuse to charge that if defendant purchased stock for which the note was given, relying on representations which were fraudulent, he had the right to maintain an action for deceit against the person guilty of fraud, or he might waive the fraud and proceed for breach of the original contract, or, having rescinded the contract, he might sue in assumpsit to recover the amount paid, which rights were open to him in defense to the note; the rights stated being in no sense defenses, but mere statements of remedies open to defendant on a hypothetical state of facts.

3. SALES—FRAUDULENT REPRESENTATIONS—MATTERS OF OPINION.

Representations made by the seller of mining stock which were mere expressions of opinion as to the value of the mining property of the corporation whose shares he was selling, together with predictions made as to future operations and profits and dividends which were expected to be realized but were not, could not 'be made the basis of a defense to an action on a note given for the price of the stock, without proof of any belief or knowledge on the part of the seller, which did not correspond with his statements and predictions.

[Ed. Note.—For cases in point, see vol. 23, Cent. Dig. Fraud, §§ 12, 13; vol. 43, Cent. Dig. Sales, § 67.]

4. APPEAL—ASSIGNMENTS OF ERROR—COURT RULES.

Under Circuit Court of Appeals, Rule 11 (90 Fed. cxlvi, 31 C. C. A. cxlvi), providing that when an error is alleged in the admission or rejection of evidence the assignment of error shall quote the full substance of the evidence admitted or rejected, an assignment that the "court erred in overruling defendant's offer of a certâin letter of H. to G." was fatally defective.

5. EVIDENCE—DOCUMENTARY EVIDENCE—LETTERS—COPIES.

Where, in an action on a note, an undated copy of a letter alleged to have been written by the payee's agent was offered in evidence, but no attempt was made to show that any original of the letter existed, and it was not proved that it actually came from the payee's agent, the copy was properly excluded.

[Ed. Note.—For cases in point, see vol. 20, Cent. Dig. Evidence, §§ 1648–1650.]

6. BILLS AND NOTES—ACTIONS—ISSUES, PROOF, AND VARIANCE.

Where, under the New Jersey statute authorizing a defendant to annex to a plea of general issue a notice of special matter, which if pleaded would be a bar to the action, and, to give evidence of such matter, the defendant in an action on a note pleaded non assumpsit, with notice, and the special matter filed was a mere statement that the note sued on was procured by the payee through fraud of which the plaintiff had knowledge, defendant was not entitled to have representations which were not of such a character as would avoid the contract for fraud considered as warranties.

7. WITNESSES—CROSS-EXAMINATION—SCOPE.

Where, in an action on a note by an indorsee, plaintiff was called as a witness for defendant and examined regarding the circumstances surrounding his becoming the owner of the note and as to what occurred between himself and the payee at the time, how much he gave for it, and how he came to purchase it, it was proper for plaintiff on cross-examination to ask the witness to give the whole conversation between the payee and himself at the time the note was purchased.

[Ed. Note.—For cases in point, see vol. 50, Cent. Dig. Witnesses, §§ 933, 1002.]

In Error to the Circuit Court of the United States for the District of New Jersey.

C. L. Cole, for plaintiff in error.

Henry D. Hotchkiss, for defendant in error.

Before DALLAS and GRAY, Circuit Judges, and BUFFINGTON, District Judge.

GRAY, Circuit Judge. George W. Crosby, by this writ of error, seeks to secure the reversal of a judgment recovered against him in the Circuit Court of the United States for the District of New Jersey, by Jabez O. Emerson, the defendant in error, for $8,640.97,

entered on a verdict in a trial before said court and a jury. The declaration is upon a promissory note for $10,000, dated New York, July 8, 1903, made by said George W. Crosby, defendant below, and payable to one W. P. Harlow, at the Guardian Trust Company, New York City, six months after date. Indorsed upon the note are the following words:

"The time for the payment of this note is hereby extended six months from January 8th, 1904. The receipt of $2,000, on account, and the accrued interest to January 8th, 1904, is hereby acknowledged.
"[Signed] .W. P. Harlow."

Below this appears the following:

"Pay to the order of J. O. Emerson without recourse.
"[Signed] W. P. Harlow."

Emerson, the plaintiff below, as indorsee, sued for $8,000, the balance due on the note, with interest from January 8, 1904. The defendant pleaded "non assumpsit," with notice under the statute of New Jersey of special matter, which was stated to be fraud in the procurement of said note, and want of consideration.

The undisputed facts, as they appear from the record and as summarized in brief of defendant in error, are: That on the 1st day of November, 1902, George W. Crosby, the plaintiff in error, was introduced to W. P. Harlow, the payee of the said note, by one Van Amburgh, at Harlow's office in New York City. At this meeting, plaintiff in error bought from Harlow 1,000 shares of Yaquie Copper Company stock, at $12.50 per share, and gave therefor his note, dated November 1, 1902, for $12,500, payable 90 days after date, to the order of W. P. Harlow. There were three persons present at this transaction, viz., plaintiff in error Crosby, Harlow, and Van Amburgh. Harlow died the 6th day of December, 1904, after the bringing of this suit but before the trial thereof. Van Amburgh was not called as a witness by either party. Crosby, as a witness in his own behalf, testified to certain representations made by Harlow at this meeting, on which the defense of fraud was predicated. He testified that he met Colonel Harlow in his office in New York, on the 1st of November, the day of the purchase of the stock, and said:

"I had a talk with him about the stock, and he told me of its merits, and he told me it was the most valuable stock in the country. It was capitalized at fifteen millions, par value of stock ten dollars, and that the capitalization was very low for the value of the property. That the property was located in Mexico, and had been worked between two and three years, and they had blocked out, ready for milling, $2,500,000 of copper ore, and the value of that ore, according to the price of copper then, was worth $60,000,000 and they were going to 'put in the smelter at once. It would be smelting ore within six months. The price of stock would advance rapidly, and would sell readily at twenty dollars a share inside of six months, and there would be no stock sold after the 15th of November for less than fifteen dollars a share; that there was a car load of supposed purchasers going to the mine on the 5th of November, and that on their departure the stock would be advanced to fifteen dollars per share. He said that within six months I could sell my stock for twenty dollars or more, and that within six months they would have the mill going, and that if I kept it I would get big dividends. That the company had no debts, and paid cash for everything, and that Colonel Harlow, president of the company, had a controlling interest in the stock, and would retain it and see that the work was pushed thoroughly."

Defendant testified that he had never received any dividends, or anything else on account of the stock.

There was no evidence whatsoever produced to show that any representations of fact imputed to Harlow as existing at the time of the interview testified to by Crosby, as distinguished from mere opinion or prognostication, were untrue. Plaintiff in error further testified that on November 20, 1902, relying upon the statements previously made to him, he bought from Harlow another 1,000 shares of the Yaquie Copper Company stock, and gave him his second note for $12,500 in payment thereof, due ninety days from date, and as collateral security for this note, he pledged the stock, 1,000 shares, to Harlow; that when these notes became due, he was "dunned" for payment by both Harlow and Van Amburgh, and that he refused to pay, because of the misstatements which had been made to him. He does not, however, testify as to what was said or took place between the parties after the two notes became due, except "they said they had been disappointed." It was shown, however, on cross-examination, that on May 18, 1903, some three months after the second note had matured, Crosby wrote Van Amburgh, stating that he was no longer in the practice of medicine, had no income, was hard pushed for money, and could not pay, closing as follows:

"If things had gone on as they were going when I bought the stock, I could have paid the notes long ago. Colonel (Harlow) has been very lenient with me, and I appreciate his kindness, but I am simply caught in the meshes. I can't sell this stock if I should try. The Colonel must take it back. That is the only way I can see out of it."

Crosby further testified that, on July 8, 1903, he saw Harlow in New York, and refused to pay the notes, on the ground that the transaction had not panned out as Harlow had said it would, and that at that meeting Harlow returned to him the note dated November 20, 1902, and that he, Crosby, paid $2,500 on the note dated November 1, 1902, and delivered to Harlow a new note for $10,000 (the note in suit), upon the understanding that:

"If they were smelting ore as he had told me, and the stock worth at least twenty dollars a share, if I was dissatisfied, he would give me back my money and note and take his stock."

Crosby also testified that, on January 8, 1904, when the second note became due, he met Harlow again, and expressed his dissatisfaction with the outcome of the transaction, and that Harlow asked him "to allow it to go six months more. He said if I would do that, if I was not satisfied at the end of the next six months, that he would take the stock and give me back my paper and give the money back." At this time, January 8, 1904, Crosby paid $2,000 on account, and the note so reduced to $8,000 was renewed for six months.

The note was bought by defendant in error, the plaintiff below, from Harlow, for $1,000 cash, on the 28th day of May, 1904, and was on that day indorsed to him without recourse by Harlow.

It is not contended that, as such indorsee, plaintiff below, though a holder for value, was in the position of an indorsee before maturity, without notice of any equity that might exist between payee and

maker. About a month prior to the expiration of the six months extension on the balance due on said note, the plaintiff below wrote to Crosby, notifying him that he was the holder of the note, and that it would become due on the 8th day of July, 1904, and that it would be forwarded to the trust company, where it was payable, for collection. Crosby replied, under date of June 18, 1904, stating that it would be impossible to raise the whole amount by the 8th of July, and that it would be a great favor to him if plaintiff would accept $3,000 and interest, and extend the time for the payment of the balance.

The assignments of error, which raise the question seriously discussed before the court, relate to a portion of the charge of the court below to the jury, and to its refusals to charge certain requests made by the defendant. Also to certain admissions of testimony, against objection by defendant, and to the overruling of certain offers of testimony by him.

The fourth assignment of error is:

"The court erred in refusing to charge the fifth request of the defendant, as follows: 'If the jury believe that any statement or representation made by Harlow to defendant, was material and fraudulent, and that defendant relied upon them as true in the purchase of the stock, defendant is entitled to judgment although he may afterwards have promised to pay the note.'"

As to this request, the learned judge of the court below, at the close of his charge, said:

"There is one request to charge here, on the part of the plaintiff, to the effect that, if the jury believe that the statements or representations made by Harlow to the defendant were material and fraudulent, and that the defendant relied upon them as true in the purchase of the stock, the defendant is entitled to judgment, though he may afterwards have promised to pay the note. I do not remember that there is any evidence of any promise made in this case to pay the note. You have the letters, and you can interpret what they mean. But I charge you, that even if he had made any such promise, it would not be binding on the defendant if the note was fraudulent, for the reason that there would be no consideration for the promise. In all other respects, I decline to charge either for the plaintiff or the defendant, except as I have charged."

Surely the plaintiff in error has no cause to complain of the charge in response to this request. It was even more favorable to him than he had a right to demand, in that the jury were told that the court did not remember that there was any evidence of any promise made by the defendant to pay the note.

The fifth assignment is:

"The court erred in refusing to charge the sixth request of the defendant, as follows. 'If the jury believe defendant purchased the stock, relying upon representations which were fraudulent, he thereby had a right to maintain an action for deceit against the person guilty of the fraud, or he might waive the fraud and proceed for a breach of the original contract, or having legally rescinded the contract, he might, in an action of assumpsit, recover for whatever he has paid upon it, and these rights are open to him in defense of this action.'"

The court, of course, was justified in refusing to make this statement to the jury. Such a statement was unnecessary, and would only

have been confusing if made. Besides, the proposition is incorrect, in stating that these rights are open to him as a defense of this action. These so-called rights are in no sense defenses, but are merely statements of remedies open to the defendant upon a certain hypothetical state of facts. The statement requested, at best is an abstract proposition of law, without relevancy to any issue in the case before the court. The defense of fraudulent misrepresentation inducing the contract, is a substantive defense, the benefit of which was fully given by the learned trial judge to the defendant in his general charge. He stated that the defense set up rested upon fraud, and correctly explained the elements of such a fraudulent representation as would avoid a contract. In doing this, the learned judge distinguished, as it is always necessary to distinguish, when an alleged ground of false representation is set up, between a representation of an existing fact and mere statements of opinion as to value, or as to prospective operations, including promises as to things in the future. In this respect, the charge of the learned judge is unexceptionable, and in fact the record discloses no assignment of error founded upon any exception to this part of the charge. There is no testimony in the record to that effect, and there has been apparently no attempt to show that any representation made by Harlow to the plaintiff in error, at the time of the purchase of the stock and the making of the note, as to an existing fact, was untrue. The general position of the defendant seems to be, that because the opinion expressed by Harlow as to the value of the mining property of the company whose shares he was selling, turned out to be wrong, and the predictions made as to future operations and profits and dividends failed to be realized, a case of fraudulent misrepresentation had been made out, and this, without showing any belief or knowledge on Harlow's part that did not correspond with his statements and predictions.

Exaggerated representations of this character, depending for their degree of color upon the temperament of the one making them, are of daily occurrence in the ordinary traffic of buying and selling between men. As a general rule, if such representations do not involve false statements as to existing matters of fact, the person to whom they are made, and whose conduct they are intended to influence, must act at his own peril in giving them credence. For such person, the maxim of "Caveat emptor" is the rule to be observed. Of course, there may be cases where the existing intention of a party, at the time of contracting, is a matter of fact and may be material to the validity of the contract, so that, if it be proved that a party has fraudulently misrepresented his intentions in some material point, for the purpose of inducing a contract, it may be a sufficient ground of fraud for avoiding a contract. In the case before us, there is no such representation of an existing intention on the part of Harlow, much less of one which he is shown to have fraudulently misrepresented. These representations of future happenings were confined to those controlled by the copper company, whose stock he was selling, but, as we have said before, no assignment of error brings before us any exception to the charge in this respect.

The next assignment of error requiring consideration at our hands, is the ninth, which is:

"The court erred in overruling defendant's offer of the letter of W. P. Harlow to Senator George E. Green."

This assignment of error is fatally defective, for want of conformity to one of the requirements of rule 11 of this court (90 Fed. cxlvi, 31 C. C. A. cxlvi), as follows:

"When the error alleged is to the admission or to the rejection of evidence, the assignment of errors shall quote the full substance of the evidence admitted or rejected."

It is hard to conceive how any attempted assignment of error could more absolutely fail to conform to either the letter or spirit of this rule, than the one we are considering. There is not even a reference to the bill of exception, or to anything else contained in the record by which the letter spoken of can be identified, and our rules would be meaningless, if so plain a want of conformity to their requirements should be ignored. We would be compelled to enforce this rule, even if we were of opinion that the letter which might be surmised to be the subject of the assignment, was competent as evidence on behalf of the defendant. We are, however, not of that opinion. The letter purports to be a letter from Harlow to one George E. Green, of New York City. It does not purport to be an original letter by Harlow, but is marked "copy." It is without date, and, although Harlow says it came by mail from Van Amburgh, who, he contends, is Harlow's agent, he says he does not know that any letter from Van Amburgh accompanied it. Certainly none was produced. Even admitting that there was evidence to show that Van Amburgh was Harlow's agent, it is hard to imagine anything more entirely in the air than is this alleged copy of a letter from Harlow to Senator Green. No attempt is made to show that any original of this letter existed. George E. Green, to whom it purports to be addressed, was not called as a witness, and nowhere appears in the case. It does not even appear that it actually came from Van Amburgh. Under these circumstances, the statements contained in this paper cannot bind Harlow or Harlow's indorsee.

The third assignment is:

"Said court erred in charging the jury as follows: 'The defense set up rests upon fraud. * * * Gentlemen of the jury, my attention was called to the fact that I said to you that there was but one defense in this case, that of fraud. My attention has further been called to the fact that there is another defense, that is breach of warranty or guaranty. It may be found by you from the evidence, that there were representations made with respect to the time that dividends would be paid on this stock. If you find from all the facts in the case, that there were representations amounting to a warranty or guaranty, representations made to Mr. Crosby by Mr. Harlow, that dividends would be paid at a fixed or definite time in the future, you have the right to consider that, and it would avoid the contract and defeat the plaintiff's right to recover, if you find that they were made and proved to be false. You must consider this and determine from all the evidence in the case whether there was any such understanding between the parties.'"

Plaintiff in error, in his contention under this assignment, assumes that all the representations made by Harlow at the time of the giving

·of the note, and which were alleged to be fraudulent, may, if they are ·not of such a character as will avoid the contract on the ground of fraud, be considered as warranties, the breach of which having been ·shown, the contract founded upon them must fall. We do not think that, in the case as disclosed by the record, he may be permitted to do this. It will be recollected that the case went to trial upon the general plea of "non assumpsit," with notice of special matter. Under the New Jersey statute, the defendant "may annex to such plea of general issue a notice of any special matter, which, if pleaded, would be a bar to such action and may give such matter in evidence." The special matter actually filed, was simply a statement that the note in suit was procured by said Harlow, through fraud, of which this plaintiff had knowledge. There is no statement of any special matter, tending to show fraud, and which might equally be evidence of warranty, and there is no intimation that there would be any special matter intro·duced in evidence to show a warranty. As the record shows, the case below was tried throughout upon the theory that plaintiff in error was induced to act under and by reason of fraudulent representations made by Harlow. The trial judge might well have declined, on this ground, to have charged the jury with reference to any supposed warranty resulting from the representations made by Harlow. He has, however, very fairly complied with the request of the defendant, by submitting to the jury the question, whether what Harlow said in regard to the probability of dividends being paid in the future, amounted to a warranty on his part that they would so be paid.

We have examined the testimony carefully in this respect, and can find nothing therein to justify the contention, that Harlow's statements at the time of the making of the note, can, in any view taken of them, be construed as warranties. The trial judge would certainly not have been justified in going further than he did in compliance with this request of defendant's counsel.

The thirteenth assignment of error is:

"The court erred in permitting the plaintiff to answer the following question: 'Tell the whole conversation between Colonel Harlow and yourself at the time the note was bought?'"

Emerson, the plaintiff and indorsee of the note, was called as a witness for the defendant, and examined by him in regard to the circumstances surrounding his becoming the owner of the note in suit. He was interrogated as to what occurred between him and Harlow at that time, as to how much he gave for it, and how he came to buy it. On cross-examination, he naturally was asked by plaintiff's counsel, to give the whole conversation between Colonel Harlow and himself at the time the note was bought, and as to which he had testified. As a matter of fact, very little was added to the very full details given by him in response to the questions of counsel for the defendant, when examined in chief. The question was clearly a proper one, and the answer elicited quite within the scope of what is permitted to be legitimately inquired about in a cross-examination.

We have carefully examined all the other assignments of error,

and are of opinion that they are without merit, and need no discussion here.

For the reasons stated, the judgment below must be affirmed, and it is so ordered.